IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

CITY OF MIDWEST CITY, a body 
corporate and politic, and a duly 
constituted municipality; and 
MIDWEST CITY URBAN RENEWAL 
AUTHORITY, a public body 
corporate, 

              Plaintiffs, 

v. 

HOUSE OF REALTY, INC.; 
et al., 

              Defendants. 

Case No. CJ-2004-9568

*FILED IN THE DISTRICT COURT OKLAHOMA COUNTY, OKLA. PATRICIA PRESLER, COURT CLERK FEB 2 2 2005 by _____ Deputy*

**DEFENDANT HOUSE OF REALTY, INC.'S RESPONSE AND OBJECTIONS TO PLAINTIFFS' PROPOSED INSTRUCTIONS TO COMMISSIONERS, WITH SUPPORTING AUTHORITIES**

    Defendant, House of Realty, Inc., ("Landowner") respectfully responds to "Plaintiffs' Motion and Brief on Requested Instructions to Commissioners", filed herein January 27, 2005, and objects to certain of the Plaintiffs' proposed Instructions to Commissioners attached thereto.  This response and objection is filed without waiver of Landowner's right to object to the right-to-take of the Midwest City Urban Renewal Authority ("URA"), or any other objections which Landowner may appropriately make in its exceptions to the report of commissioners.

    A landowner's challenge to a condemnor's condemnation petition is limited to the filing of exceptions to the report of commissioners.  Motions to dismiss and answers are not recognized as appropriate pleadings in condemnation

1



DEFENDANTS' 
EXHIBIT 4

proceedings. *Board of County Commissioners of Creek County v. Casteel*, 1974 OK 31, 522 P.2d 608. However, the quest to seek appropriate instruction of commissioners, occurring early in the proceedings, does present each party with the opportunity, if not the obligation, of presenting its position relative at least to the task of the commissioners in determining the landowner's damages. See *State ex rel. D.O.T. v. Watkins*, 1999 OK CIV APP 122, 993 P.2d 144 wherein the Court of Appeals states:

> "¶7 To prevent future deficiencies in commissioner appraisals, we hold that both the condemnor and the landowners bear an equal burden to see to it that the instructions to the commissioners contain all the necessary information, and are otherwise sufficiently framed, to allow the commissioners to perform their statutory duties. The commissioners must be provided sufficient information to "consider the injury which the owner may sustain by reason of the condemnation, and . . . assess . . . the just compensation for the property taken, and the amount of injury done to the property, either directly or indirectly." 69 O.S. 1991 § 1203(c).

Certain of Plaintiffs' proposed instructions go significantly beyond and materially depart from the standard instructions to commissioners (see OUJI 2d No. 25, attached hereto as Exhibit "D") and from both statutory and case-law authority in this State for condemnation. In this response, Landowner will present its objections in the order the instructions were proposed by Plaintiffs.

Before discussing Plaintiffs' proposed instructions, however, Landowner states his objection to the opening paragraph (of a full page in length) of Plaintiffs' motion. In this paragraph, Plaintiffs attempt to "set the scene" for their proposed instructions by providing this Court with the background of this case. Plaintiffs' opening paragraph is both incomplete and misleading. Plaintiffs'

2

misrepresentations and omissions in their opening paragraph are material to
several of URA's proposed instructions to commissioners.

**The Plaintiffs' background statement contained in the opening paragraph
of their motion is incomplete and misleading.**

Plaintiffs' opening paragraph would give anyone unfamiliar with the
background of this case the impression that the City's redevelopment project
commenced in or near May, 2002, with a finding of blighted conditions under the
Urban Renewal Act; and that this May, 2002, finding was followed by a
subsequent August, 2002, finding "specifically determining the Project Area
'blighted' within the meaning of the Urban Renewal Law". Plaintiffs' opening
paragraph then refers to the Oklahoma Supreme Court decision in "a prior
condemnation action concerning the subject property", *City of Midwest City v.
House of Realty, Inc.*, 2004 OK 56, (Exhibit "E", attached hereto) implying that
this decision simply held that all the City had to do was to go back and proceed
under the Urban Renewal Act, adopting the same findings of blight which the City
purportedly made in May and August, 2002. The Plaintiffs close their
background statement by saying this is now what they've done.

Any statement or inference that the City determined in 2002 that the
Project Area contained blighted conditions *as defined by the Urban Renewal Act*
is false and misleading. In truth and in fact, the City made no valid finding of

3

blight under the Urban Renewal Act, either in 2002 or at anytime theretofore or thereafter.[1]

The City's original condemnation petition against the property subject of this action was filed in June, 2001, and was based upon a resolution authorizing condemnation dated January 21, 2001. As pointed out by the Oklahoma Supreme Court in *Midwest City v. House of Realty, Inc.*, 2004 OK 56, the City initially made no pre-petition blight determination and argued that it had the power of eminent domain, for the purported public purpose of "economic development", under the general legislative grant of the power of eminent domain to municipalities under 27 O.S. § 5 for public purposes. *Id.*, ¶¶ 6 and 7, n. 2. In the early stages of the proceedings, Landowners asserted that economic development, alone, was not a public purpose under either the general grant of the power of eminent domain or under specific redevelopment statutes granting eminent domain power. The City's Director of Development services testified on two occasions that the City did not believe the project area to meet the statutory definitions of blight under the special redevelopment acts, to wit, the Urban Renewal Act and the Neighborhood Redevelopment Act. (One of those occasions is referred to by the Oklahoma Supreme Court, *Id.*, ¶¶ 9 and 10.) After Landowner's challenge based upon the City's failure to find the area to be blighted, someone obviously came up with the idea to have the City make a retroactive finding of blight under the Local Development Act's less stringent

---

[1] Plaintiff's Petition in this case (¶ 4, p. 4) refers to an October 12, 2004, finding of blight "pursuant to the Urban Renewal Law (sic), 11 O.S. § 38-101, *et seq.*" This purported finding of blight will be challenged by Landowner at its first opportunity to do so, i.e. within 30 days following the filing of the report of commissioners.

definition of "blight".  *Id.*, ¶ 13 (along with the contention that the Local

Development Act impliedly authorized the power of eminent domain):

> "¶ 13 Then, while the condemnation proceeding was pending, the
> City of Midwest City passed two resolutions linking its Project to specific
> redevelopment statutes. . . .  in accordance with the Local Development
> Act, *62 O.S. §§ 850 et seq., . . . .*"

But, as admitted by the City, the Local Development Act did not expressly

provide the power of eminent domain, and the Supreme Court held the Local

Development Act did not give a municipality an implied power of eminent domain.

*Id.* ¶ 20.  The City's post-petition, 2002, resolution and ordinance, although

meeting the Local Development Act's definition of blight, failed to meet the more

stringent definitions of either the Urban Renewal Act or the Neighborhood

Development Act.  See discussion, *Id.*, ¶¶ 28-35.

Specifically, the Supreme Court stated:

> "¶31 The definition of a 'blighted area' in the Local Development Act is
> broader, and more easily applied by a municipality than the definitions in either
> the Urban Renewal or Neighborhood Redevelopment Act.  The Neighborhood
> Redevelopment Act requires the presence of a majority of ten factors.  The
> Urban Renewal Act requires that the factors used to show the presence of a
> blighted area have at least one of four effects on the municipality: substantial
> impairment of growth, economic or social liability, danger to life or property, or
> detrimental conduciveness to disease or social disorder.  11 O.S.2001 § 38-
> 101(8).  Such predicates are not required by the Local Development Act."

> . . .

> "¶33 The City of Midwest City argues for being allowed to use the least
> restrictive definition for a 'blighted area' when condemning private property
> without an express grant of that authority, . . . ."

> "¶34  . . . .  The City of Midwest City states that the property for its project
> is blighted for purposes of the Local Development Act.  The City's made this
> determination using, with one exception, language from the Local Development
> Act. . . ."

The Court demonstrated that the City's 2002 ordinance (like its resolution) failed to meet either the standards of the Urban Renewal Act or the Neighborhood Redevelopment Act.

The City's 2002 "blight" determinations were not incorporated into the case until long after Landowner had filed its exceptions to the report of commissioners, leaving the Landowner with no ability, under condemnation procedure, to challenge in court the post-petition (and post-exceptions to commissioners report) blight findings.  Landowner raised this issue under the rubric of a denial of procedural due process.  The Court's decision, however, made it unnecessary that the Court deal with this constitutional issue.  The Court held that the City had simply failed to follow the requisites of either the Urban Renewal Act or the Neighborhood Redevelopment Act, either pre-petition or post-petition.  In no way did the Court state or imply that all the City need do is to go back, create an Urban Renewal Authority, which could then file a new condemnation suit to take Landowner's property, relying in part or in whole upon the previous determinations of blight made in 2002.

Furthermore, the opening paragraph of URA's motion omits to inform this Court that it wasn't until September 16, 2004, that the Midwest City Urban Renewal Authority was even created, and that, originally, the sole purpose of its creation was to condemn Landowner's 1.25 ac. tract of land located at the southwest corner of the Project Area.  Nor does the opening paragraph of URA's motion disclose that at the time of the City's October 12, 2004, "blight determination" (and the creation of the URA on September 16, 2004), the entire

6

80+ acre project area, including Landowner's 1.25 ac. tract, had been completely bulldozed and cleared of all improvements, structures and buildings. Since the URA was not in existence at the time of this demolition and leveling, it can hardly be held responsible for the destruction of Landowners' buildings. Landowner does intend, however, to hold the City and its Hospital Authority responsible for tort damages it has sustained, as is evidenced by Landowner and Tenants' motion for leave to file a counterclaim and cross-petition for damages against the City and the Hospital Authority, filed commensurate herewith.

Because the City is seeking only the approximate west ten feet (10') of the Landowner's property for a turning lane into the shopping mall, any blight determination is immaterial to the City's condemnation suit. As stated in its motion to instruct commissioners, Landowner has no objection to the City's taking of the land for the turning lane right-of-way.

### Objection to Plaintiffs' Requested Instructions to Commissioners

**Plaintiff's Proposed Instruction No. 1—** For the reasons stated in the Landowner's motion to instruction commissioners filed January 27, 2005, the commissioners should be instructed to provide separate appraisals for each of the two separate tracts sought by the City and the Urban Renewal Authority, separately. This will allow the Landowner to file separate and distinct exceptions to the commissioners' reports. Or, it will allow the Landowner to potentially accept the report as to the right-of-way. If one appraisal is made, it will be impossible for Landowner to accept the report on the right-of-way, while objecting

7

to the report on the remainder of the tract sought by URA. Landowner has submitted herewith, Exhibits "A", "B" and "C", a set of plot plans showing Project Area and the Landowner's tract of land in the Project Area.

    **Plaintiffs' Proposed Instructions Nos. 2, 3, 4**—Landowner has no objection to ¶ 2, 3, and 4 of Plaintiffs' proposed instructions, provided that each of these instruction be given separately—once as to the property sought by the City and once as to the property sought by the Urban Renewal Authority.

    **Plaintiffs' Proposed Instruction No. 5**—Landowner objects to No. 5 of Plaintiffs' proposed instruction, except for the first sentence. In this case, there were no moving costs because the Landowner was not located upon the premises as of the date of taking. Nor was the date of taking April 30, 2004, as stated in Plaintiffs' proposed No. 5 instruction. Nor were there any buildings on the land at the date of taking, as referred to in the said proposed instruction.

    Plaintiffs' proposed instruction is an attempt to set the date of taking as April 30, 2004, and to have the commissioners award Landowners' damages for moving costs and demolition of his buildings. This is inappropriate because the Urban Renewal Authority had absolutely nothing to do with either the eviction of Landowner or the demolition of its buildings in April 2004.

    Oklahoma condemnation statutory and case law provide the date of taking to be the date upon which the condemnor deposits the commissioners' award with the court clerk. It has been repeatedly held in Oklahoma that under condemnation procedure, the condition of the property is to be determined as of the time of taking, and that the time of taking is the date the condemnor pays the

award of the commissioners. The Oklahoma Supreme Court first dealt with this

issue in *Stinchcomb v. Oklahoma City*, 1921 OK 154, 81 Okl. 250, 198 P. 508,

and treated it very thoroughly, stating:

". . . The market value should be determined as of the date of the taking,
and under our Constitution the taking is not until the money is paid.

. . .

"If the city desired that the damages should have been estimated as of
March 9, 1917, the date the commissioners filed their report, and they had gone
to the clerk of the court and paid the amount of the award to the clerk of the court
on that day, then they would be in a position to invoke the rule, but they did not
pay the money until April 25, 1917, and we have a right to presume that possibly
the prospects of the wheat crop at that time had something to do with the city
making the payment on that date. They could have delayed making the payment
until they were ready to take possession of the property to begin the
improvement. But if they had done so and delayed beyond the harvest of the
wheat crop, the crop would have gone to the owner of the land." 198 P. at 513.

The reverse of the timing in the *Stinchcomb* case is the situation in the

case at bar. But, the principal is still the same. The **earliest** date upon which the

condemnor can take the property is the date the commissioners report is filed.[2]

In the case at bar, the URA wants the taking to be April 30, 2004, so it can argue

that the Landowner's damages are limited to the greater of the value of the land

with the buildings or the land without the buildings. As an agent of the City, the

URA is attempting to exclude the damages arising from the demolition of

Landowner's buildings, for which the City is liable. This is obviously URA's

---

[2] A "taking" for purposes of ascertaining the date of determination of damages by the
commissioners (and jury) must be distinguished from a "taking" for purposes of ascertaining when
the condemnor may take actual physical possession of the property. The latter "taking" cannot
occur until all issues regarding the condemnor's right-to-take and/or necessity have been finally
resolved. *Town of Ames v. Wybrant*, 1950 OK 197, 203 Okl. 307, 220 P.2d 693, holds that the
Courts have the power to "make an order temporarily restraining the condemnor from taking
possession of the land pending final determination of the right to condemn." 220 P.2d at 309-
310. Due process requires the landowner be given the opportunity to challenge in an evidentiary
hearing the condemnor's right to take. *Public Service Co. v. B. Willis, C.P.A.*, 1997 OK 78, 941
P.2d 995.

motive for attempting to have this Court instruct the commissioners to appraise the land as of April 30, 2004. It is Landowner's right, as well as appropriate condemnation procedure, that the land sought by the URA be appraised as of the date upon which the commissioners make their inspection and file their report with the court clerk.

The commissioners should be instructed as to the proper date when the damages are to be estimated. *City of Tulsa v. Horwitz*, 1928 OK 350, 131 Okl. 63, 267 P. 852. Damages resulting from a taking are to be distinguished from tort damages. A separate claim for tort damages may be brought by the landowner in the condemnation proceeding. *Allen v. Transok Pipe Line Co.*, 1976 OK 53, 552 P.2d 375, 379; *Ward Petroleum Corp. v. Stewart*, 2003 OK 11, 64 P.3d 1113.

Also motivating the Plaintiffs to have this Court determine April 30, 2004 to be the date of taking is the fact that elements and measures of damages in condemnation proceedings are more restrictive than in tort actions. A separate trial of Landowner's (and its tenants') damages will be accomplished by their counterclaim and cross-petition. The appraisers should not become involved in determining the value of buildings which are not on the premises at the date of taking, but which were demolished long before the URA even came into existence.

Plaintiffs' Instruction No. 5 should read:

"The term 'just compensation' means the payment to Owner for the taking of its property by Condemnor of an amount of money that will make Owner whole. In this case this is the fair market value of the property on the date you

10

file your report with the Court Clerk, which is the earliest date the property can be taken by the Condemnor."

See also, OUJI 2d No. 25.2.

**Plaintiffs' Proposed Instruction No. 6**—Landowner objects to the last

sentence of Plaintiffs' proposed instruction No. 6 (p. 5 of Plaintiffs' motion).

Plaintiffs' proposed instruction No. 6 defines fair market value.  The second (last)

sentence of Plaintiffs' proposed instruction No. 6 reads:

> ".  .  .  The fair market value of a property should be determined regardless of what it may have been used for in the past or what future use the owner may have intended for it."

OUJI 2d Instruction No. 25.5 defines fair market value in condemnation

proceedings and states as follows:

> "The fair market value of a property is the amount of money which a buyer, who is willing but does not have to buy, would pay an owner, who is willing but does not have to sell, to buy the property.  [The fair market value of a property should be determined according to the highest and best use for which it is suitable, regardless of what it may have been used for in the past or what future use [Owner] may have intended for it.]"

### "Notes on Use

> "The amount of just compensation is defined in terms of fair market value. Accordingly, this Instruction should be given along with the appropriate Instruction concerning just compensation.  The last sentence should be given only if there is a possibility that the jury may base its valuation on other than the property's highest and best use."

Plaintiffs ask this Court to instruct regarding use, but to omit the phrase **"should**

**be determined according to the highest and best use for which it is**

**suitable**", contained in OUJI 2d No. 25.5.  Landowner agrees with Plaintiffs that

there is a possibility that the commissioners may base their valuation on other

than the property's highest and best use as of the date of taking.  Therefore, the

Court should instruct on use, but in the language provided by OUJI—not by the

Plaintiffs.  The authors of OUJI 2d No. 25.5's use language relied upon *City of*

*Tulsa v. Creekmore*, 1934 OK 57, 167 Okl. 298, 29 P.2d 101.  In addition,

Landowner refers this Court to *McAlester Urban Renewal Authority v. Lorince*,

1972 OK 109, 499 P.2d 925, wherein the Oklahoma Supreme Court held that if

the property were otherwise suited for commercial use, the fact it wasn't zoned

commercial would not preclude the jury from considering its commercial use as

its highest and best use.  See also, *Arkansas Louisiana Gas Company v. Cable*,

1978 OK 133, 585 P.2d 1113.

Landowner submits the instruction should read:

"The fair market value of a property is the amount of money which a
buyer, who is willing but does not have to buy, would pay an owner, who is willing
but does not have to sell, to buy the property. The fair market value of a property
should be determined according to the highest and best use for which it is
suitable, regardless of what it may have been used for in the past or what future
use the Owner may have intended for it."

This was precisely the same instruction to commissioners requested by the City

of Midwest City and given by the Court in the prior case involving the subject

property (except it was given prior to the removal of the buildings), CJ-2001-

4916.  (Exhibit "F", attached hereto.)  Apparently, the intervention in this case of

the Midwest City Urban Renewal Authority has provoked a change in requested

instructions, improperly slanted in favor of the condemnor.


**Plaintiffs' Proposed Instruction No. 7**—Landowner objects to ¶ 7 of

Plaintiffs' proposed instruction.  The unusual circumstances of this case make

such instruction inappropriate, at least without some modification, due to URA's late involvement.   Due to the decision of the Supreme Court in *Midwest City v. House of Realty*, supra, the City and Hospital Authority transferred the project to the URA.   As admitted by the URA, the Housing Authority and City had no right to condemn Landowner's property.   However, long before the URA got involved, the Housing Authority and City cleared all of the land comprising the project area, adopted a PUD for the project area, and entered into a development agreement with the redeveloper pursuant to which the Hospital Authority was to ground lease the project area owned by the Hospital Authority (and excluding, by force of law, Landowner's property) to the redeveloper, and anticipated sub-leases to various retailers.

Landowner will be denied the highest and best use of its property as of the time of taking if the commissioners (and jury) are forbidden to take into consideration any increase in the value of Landowner's property by virtue of the actions of the City and Hospital Authority.

Plaintiffs' proposed instruction, if construed to exclude from consideration any and all acts of the City and Hospital Authority in connection with the project area, is contrary to the constitutional right of the Landowner to receive compensation based upon the highest and best use of his property.   Okla. Const. Art II, § 24; U.S. Constitution, 5th and 14th Amendments.   The situation as it existed at the time of the taking, rather than at some other time, "is controlling". *Meriwether v. Gulf Oil Corporation*, 1956 OK 189, 298 P.2d 758, 761.

Landowner submits that because the City and Hospital Authority had no

right to condemn its property, any acts on their part taking place prior to the involvement of the URA may be considered by the commissioners, as well as by the jury.  The situation would be no different had a private developer purchased the 80+ acre area, excepting for Landowner's property, then the URA had decided to condemn the entire private project area, and attempted to add Landowner's property by condemnation.  While the URA decision and actions to take over the project may not be considered in determining the value of Landowner's property, clearly the City and Housing Authority's earlier decision and work pursuant thereto to develop the area, except for Landowner's property, is admissible evidence of the value of Landowner's property at the time of taking.

If the URA had commenced the project from the start, the situation might be different and as anticipated by 11 O.S.2001 § 38-111(A).  But, that isn't the situation, and the URA should not be allowed to deprive the Landowner of the full fair market value of his property, with consideration of its condition at the time of the taking.  11 O.S.2001 § 38-111(A) must be limited to URA's actions—and not its predecessors who were without the power of eminent domain.  Plaintiffs' proposed instruction to commissioners No. 7 should be modified to read as follows:

"7. The award of compensation for property taken for a project, as of the point in time the Midwest City Urban Renewal Authority became involved (October 12, 2004) shall not be increased nor decreased by reason of any increase or decrease in the value of the property caused by any assembling, clearance, reconstruction, or proposed assembly, clearance or reconstruction in the project area by Midwest City Urban Renewal Authority.  However, any change in value due to acts or work performed prior to October 12, 2004 by the City of Midwest City and the Midwest City Memorial Hospital Authority may be considered by you."

14

**Plaintiffs' Proposed Instructions Nos. 8, 9, 10**—Landowner has no objection to ¶¶ 8, 9 and 10 of Plaintiffs' proposed instructions, provided that each of these instruction be given twice—once to the property sought by the City and once to the property sought by the Urban Renewal Authority.

Respectfully submitted,

Terry Guy Shipley   OBA No. 8183
2600 Van Buren, Suite 2633
P. O. Box 721690
Norman, OK 73070
Ph. (405) 360-4200
Fax (405) 360-4284

ATTORNEY FOR DEFENDANT
HOUSE OF REALTY, INC.

15

## Certificate of Service

I hereby certify that on this _22_ day of _February_____, 2005, a true and correct copy of the foregoing instrument was mailed, with postage prepaid, to:

Katherine E. F. Bolles
City Attorney
100 North Midwest Boulevard
P. O. Box 10570
Midwest City, OK 73140

and

James R. Waldo
MOCK, SCHWABE, WALDO, ELDER, REEVES & BRYANT
Fourteenth Floor
Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102
ATTORNEYS FOR PLAINTIFF, CITY OF MIDWEST CITY

James Dan Batchelor
Leslie V. Batchelor
Emily K. Pomeroy
CENTER FOR ECONOMIC DEVELOPMENT LAW
301 N. Harvey, Suite 200
Oklahoma City, OK 73102
ATTORNEYS FOR MIDWEST CITY URBAN RENEWAL AUTHORITY

C. Wesley Lane II
District Attorney
Gretchen Crawford, Assistant District Attorney
505 County Office Building
Oklahoma City, OK 73102
ATTORNEYS FOR DEFENDANTS, FORREST FREEMAN, COUNTY TREASURER
and BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY

Terry Guy Shipley



PROJECT AREA

EXHIBIT "A"

Map of Midwest City Downtown Redevelopment
Project Area and Increment District

TINKER AIR FORCE BASE

Ex. "A"

= Air Depot Tract

= Marshall Tract





0   100   200   300

1"=100'

**PRINCIPAL IN CHARGE**
Frank Goppold, AIA
**PROJECT MANAGER**
Frank Goppold, AIA
**DRAWN BY**
Chad Chastain, RLA

| NO. | REASON | DATE |
|-----|--------|------|
|     |        |      |
|     |        |      |
|     |        |      |
|     |        |      |
|     |        |      |
|     |        |      |
|     |        |      |
|     |        |      |
|     |        |      |
|     |        |      |
|     |        |      |

# DEVELOPMENT PLAN

## 123.5416.05

| 8/02/2004 | DP-6 |
|-----------|------|



EXHIBIT

Ex. "G"

# CHAPTER TWENTY FIVE

## CONDEMNATION

## LIST OF CONTENTS

INSTRUCTION NO. 25.1   INTRODUCTION ........................................................................355

INSTRUCTION NO. 25.2   JUST COMPENSATION — FULL TAKING ...................................355

INSTRUCTION NO. 25.3   JUST COMPENSATION — PARTIAL TAKING...........................356

INSTRUCTION NO. 25.4   JUST COMPENSATION — EASEMENT......................................358

INSTRUCTION NO. 25.5   FAIR MARKET VALUE — DEFINITION....................................359

INSTRUCTION NO. 25.6   EVIDENCE OF COMPARABLE SALES.......................................361

INSTRUCTION NO. 25.7   VERDICT — SINGLE SUM ONLY ...........................................362

**Instruction No. 25.1**

## INTRODUCTION

The term "eminent domain" describes a special legal proceeding in which a [(government agency)/railroad/(public utility)] acquires private property for a public purpose. It is also called a condemnation proceeding.

The Oklahoma Constitution allows private property to be taken for a public use if just compensation is paid to the owners of the property that is being condemned.

In this case, [Condemnor] is authorized by law to take [describe the property being condemned] for [state the purpose for the taking]. In your deliberations, you should not consider whether or not the taking was necessary, wise, or proper. That has already been decided, and it is not an issue in this case.

As jurors, it will be your duty to determine the amount of just compensation to be paid by [Condemnor] to [Owner].

### Notes on Use

This Instruction provides a Statement of the Case and introduces the other Instructions in this Chapter.

### Comments

Okla. Const. Art. 2, § 24 provides in pertinent part: "Private property shall not be taken or damaged for public use without just compensation."

---

**Instruction No. 25.2**

## JUST COMPENSATION — FULL TAKING

The term "just compensation" means the payment to [Owner] for the taking of [his/her/its] property by [Condemnor] of an amount of money that will make [Owner]

whole.  In this case this is the fair market value of the property on _____, the date of the taking.  The property includes the land and any buildings or other things that are attached to the land.

### Notes on Use

This Instruction should be used only when all of a particular property is condemned so that there are no problems involving the effect of the taking on the valuation of any remaining property.  It should be given along with Instruction No. 25.5, "Fair Market Value — Definition," and other appropriate Instructions.

### Comments

The 1990 amendment to Okla. Const. Art. 2, § 24 provides in pertinent part: "Just compensation shall mean the value of the property taken ...."  Oklahoma cases decided prior to this amendment used fair market value as the standard for just compensation.  *E.g., Grand Hydro v. Grand River Dam Auth.*, 192 Okla. 693, 694, 139 P.2d 798, 800 (1943) ("The measure of compensation in [a condemnation proceeding] is the fair market or cash value of the land condemned.").

---

**Instruction No. 25.3**

## JUST COMPENSATION — PARTIAL TAKING

This is a case in which [Condemnor] is taking only a part of [Owner's] property, and it is sometimes referred to as a "partial taking" case.  In a partial taking case, the term "just compensation" means the payment to [Owner] for the taking of a part of [his/her/its] property by [Condemnor] of an amount of money that will make [Owner] whole.  In this case this is the fair market value of the part of the property that was taken **plus** any injury to the property left remaining after the taking.  The property that was taken is [describe the property that was taken], and the property left remaining after the taking is [describe the remaining property].  The property includes the land, any buildings or other things

that are attached to the land, and any other interests connected with the use of the land, such as access to roads.

Injury to the remaining property is the damage, if any, caused by:

1.  The separation of the part taken from the remaining property;

2.  The loss [or impairment] of a right of access to the [street/road/highway] that previously abutted [Owner's] property; [and]

3.  The construction [and/or] use of the [describe the project] on the property being taken.

In determining the injury to the remaining property, you may subtract any increase in its value that will result from any features of the project that will benefit the remaining property. However, the increase in value to the remaining property can never exceed the damage to it. In other words, you may offset an increase in the value of the remaining property against any injury to the remaining property, but you may not offset an increase in the value of the remaining property against the value of the property that was taken.

## Notes on Use

This Instruction should be used in cases involving a partial taking. It should be given along with Instruction No. 25.5, "Fair Market Value — Definition," and other appropriate Instructions. The trial judge should include items 1, 2, and/or 3 in the second paragraph, depending on the type of injury to the remaining property that is alleged.

## Comments

The 1990 amendment to Okla. Const. Art. 2, § 24 provides in pertinent part:

Just compensation shall mean the value of the property taken, and in addition, any injury to any part of the property not taken. Any special and direct benefits to the part of the property not taken may be offset only against any injury to the property not taken.

In 1991, the Oklahoma Legislature added the following paragraph in 66 O.S.1991 § 53(D), 69 O.S.1991 §§ 1203(h), 1708(d):

"Just compensation", as used in [subsection C of] this section, shall mean the value of the property taken, and in addition, any injury to any part of the property not taken. Any special and direct benefits to the part of the property not taken may be offset only against any injury to the property not taken. If only a part of a tract is taken, just compensation shall be ascertained by determining the difference between the fair market value of the whole tract immediately before the taking and the fair market value of that portion left remaining immediately after the taking.

The last sentence in these paragraphs that were added may be inconsistent with  the preceding two sentences and with the portion of the 1990 amendment to Okla. Const. Art. 2, § 24 that is quoted above. Accordingly, the formula from the last sentence of these paragraphs is not included in the Instruction.

---

**Instruction No. 25.4**

## JUST COMPENSATION — EASEMENT

This is a case in which [Condemnor] is taking a kind of property called an "easement," which is a right to control and use the property of another for specific purposes. The easement being taken by [Condemnor] is an easement for [describe purpose of easement], and it will continue [(until _____)/(until [Condemnor] has no further use for it)/forever]. During the existence of the easement [Owner] will have no use, control or possession of the property within the easement that is inconsistent with [describe the easement].

In a taking of an easement case, the term "just compensation" means the payment to [Owner] for the taking of the easement by [Condemnor] of an amount of money that will make [Owner] whole. In this case this is the fair market value of the easement **plus** any injury to the property left remaining after the taking. The property includes the land,

any buildings or other things that are attached to the land, and any other interests connected with the use of the land, such as access to roads.

In determining the injury to the remaining property, you may subtract any increase in its value that will result from any features of the easement that will benefit the remaining property. However, the increase in value to the remaining property can never exceed the damage to it. In other words, you may offset an increase in the value of the remaining property against any injury to the remaining property, but you may not offset an increase in the value of the remaining property against the value of the easement.

### Notes on Use

This Instruction should be used in cases involving the acquisition of an easement. It should be given along with Instruction No. 25.5, "Fair Market Value — Definition," and other appropriate Instructions.

---

## Instruction No. 25.5

# FAIR MARKET VALUE — DEFINITION

The fair market value of a property is the amount of money which a buyer, who is willing but does not have to buy, would pay an owner, who is willing but does not have to sell, to buy the property. [The fair market value of a property should be determined according to the highest and best use for which it is suitable, regardless of what it may have been used for in the past or what future use [Owner] may have intended for it].

### Notes on Use

The amount of just compensation is defined in terms of fair market value. Accordingly, this Instruction should be given along with the appropriate Instruction concerning just compensation. The last sentence should be given only if there is a possibility that the jury may base its valuation on other than the property's highest and best use.

## Comments

In *City of Tulsa v. Creekmore*, 167 Okla. 298, 29 P.2d 101 (1934), the Oklahoma Supreme Court adopted the following standards for fair market value from Nichols on Eminent Domain (2nd Ed.):

> By fair market value is meant the amount of money which a purchaser willing but not obliged to buy the property would pay to an owner willing but not obliged to sell it, taking into consideration all uses to which the land was adapted and might in reason be applied.

> In determining the market value of a piece of real estate for the purposes of a taking by eminent domain, it is not merely the value of the property for the use to which it has been applied by the owner that should be taken into consideration, but the possibility of its use for all purposes, present and prospective, for which it is adapted and to which it might in reason be applied, must be considered, and its value for the use to which men of prudence and wisdom and having adequate means would devote the property if owned by them must be taken as the ultimate test. 167 Okla. at 300, 29 P.2d at 103-04.

In *Oklahoma Turnpike Auth. v. Daniel*, 398 P.2d 515 (Okla. 1965), the Oklahoma Supreme Court Stated:

> In this jurisdiction the rule is well settled that, where a part only of a tract of land is so condemned and damages are sought for the value of that taken, and damages to that not taken, the measure of damages is the difference between the fair market value of the whole property immediately before the taking and the fair market value of the portion left immediately after the taking. 398 P.2d at 517

This method of determining value of property in a condemnation proceeding has been referred to as the "before and after" method. This method has been widely used by appraisers as a basis for their opinions of value of property in condemnation proceedings.

**Instruction No. 25.6**

# EVIDENCE OF COMPARABLE SALES

To determine the fair market value of a property, you may consider evidence of comparable sales of other property. Generally, the more similar one property is to another, the closer their values are. In weighing evidence of a comparable sale, you should consider how similar the other property is to the property that was taken. The following are some of the many factors to consider:

1.     How far away the other property is;

2.     How similar the neighborhoods are in which the properties are located;

3.     Any zoning or other restrictions on the uses to which the properties may be put;

4.     The size, condition, and shape of the properties;

5.     How close the date of the other sale was to the date of the taking;

6.     The terms of the other sale; and

7.     Whether the other sale was a voluntary, arms length transaction.

No two properties are identical, and you will need to make appropriate adjustments to account for differences between the properties.

## Notes on Use

This Instruction should be given when, as is normally the case, there is evidence offered concerning comparable sales.

## Comments

The use of comparable sales to establish fair market value was approved in *Coogan v. Arkla Exploration Co.*, 589 P.2d 1061, 1063 (Okla. 1979) ("[T]he majority rule, adhered to in this State is that the value of land or interest in realty at a particular time may as a general rule be proved by evidence of voluntary sales of similar property in

the vicinity made at or about the same time."); *State ex rel. Department of Highways v. Aker*, 507 P.2d 1227, 1228 (Okla. 1973) ("Oklahoma has followed what seems to be the general rule that evidence of comparable sales is admissible either as direct proof of value or in support of the opinion of an expert, [citation omitted].").

Instruction No. 25.7

## VERDICT — SINGLE SUM ONLY

You are instructed that your award in this case shall be for a single sum of money. Do not award separate sums of money for each portion of property taken or each item of damage that [Owner] suffered on account of the taking. [Also, do not award separate sums of money for each of the owners of the property being taken.].

### Notes on Use

Include the last sentence only if the property being taken has multiple owners.

**OSCN**
WWW. oscn.net

THE **OKLAHOMA STATE COURTS** NETWORK

Home   Courts   Court Dockets   Legal Research   Calendar         Help
Previous Case  Top Of Index  This Point in Index  Citationize  Next Case

Oklahoma Supreme Court Cases

# CITY OF MIDWEST CITY v. HOUSE OF REALTY, INC.

**2004 OK 56**
**100 P.3d 678**
**Case Number: 100064**
**Decided: 06/29/2004**

## THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2004 OK 56, 100 P.3d 678

CITY OF MIDWEST CITY, a body corporate and politic, and a duly constituted and qualified municipality, Plaintiff/Appellee,

v.

HOUSE OF REALTY, INC.; ROBERT J. BARTON; PAMELA L. BARTON-STOBER; DOUGLAS D. STOBER; KATHY L. GIVENS; SHARLETTE R. MADISON; JEFFREY C. TACKETT; HARLAN DRAKE; PHILLIS CASEY; KEITH CASEY; LARRY PHILLIPS; IRIS JONES; DONNA GUNTER; DIANE FRITH; RICHARD SPRIGGS; LEONARD SEWELL; ARTHUR LEWIS; DANNY WATSON; MYRON NICEWANDER; WILLIAM KLUKOSKE; LAWRENCE HAWKINS, Defendants/Appellants.

CITY OF MIDWEST CITY, a body corporate and politic, and a duly constituted and qualified municipality, Plaintiff/Appellee,

v.

SHIRLEY A. "GOETSCH" BARTON, Trustee of the Shirley A. "Goetsch" Barton Revocable Trust, dated September 23, 1992; ROBERT J. "BOB" BARTON, Trustee of the Robert J. "Bob" Barton Revocable Trust, dated September 23, 1992, Defendants/Appellants.

## APPEALS FROM THE DISTRICT COURT OF OKLAHOMA COUNTY

¶0 A municipality brought two condemnation proceedings in the District Court of Oklahoma County for the purpose of obtaining property located in an economic redevelopment project designed to remove blighted property. The Honorable Daniel Owens, District Judge, confirmed the reports of the commissioners and the landowners appealed. This Court retained the two appeals and heard oral argument en banc. We consolidate the two appeals for the purpose of one opinion addressing both. We hold that the municipality did not possess authority to exercise one of its eminent domain powers to remove blighted property for purposes of the Local Development Act, 62 O.S. 2001 §§ 850 et seq., when the municipality did not comply with specific eminent domain statutes for the removal of blighted property and economic redevelopment by municipalities and public trusts.

## ORDERS OF THE DISTRICT COURT REVERSED

James R. Waldo, Mock Schwabe, Waldo, Elder, Reeves & Bryant, Oklahoma City, Oklahoma, for Plaintiff/Appellee.
Catherine E. F. Bolles, City Attorney, City of Midwest City, Midwest City, Oklahoma, for Plaintiff/Appellee.
Jerry Guy Shipley, Norman, Oklahoma, for Defendants/Appellants.

EDMONDSON, J.

¶1 The central issue in this controversy is whether a municipality's authority to condemn property for economic redevelopment and blight removal is limited to special statutes expressly giving such authority, or in the alternative whether a municipality may condemn property for blight removal and economic development pursuant to a general power of eminent domain. In this controversy a municipality and a public trust have jointly created, funded, and operated an economic redevelopment project that included the removal of blighted property. We hold that a municipality may not use a general power of eminent domain for the purpose of economic development and blight removal when it is acting jointly with a public trust. This is so because the Legislature has provided specific procedures for economic redevelopment and blight removal by the joint conduct of municipalities and public trusts.

¶2 The City of Midwest City and the Midwest City Memorial Hospital Authority have a joint plan to redevelop approximately eighty acres of land on S.E. 29th Street in Midwest City. The eighty acres consist of approximately two-hundred separate parcels known

as the City of Midwest City Downtown Redevelopment or "Project Area." Midwest City Hospital Authority agreed to advance funds to the City in an amount not to exceed $30,000,000 (thirty million dollars) for acquiring the property necessary for redevelopment. The members of the City Council for Midwest City are also the Trustees of the Midwest City Memorial Hospital Authority.

¶3 The Authority provides funds to Midwest City to acquire title to some of the property using condemnation proceedings. Once the City obtains the property it transfers title to the Hospital Authority. The Hospital Authority has entered into a contract with a private developer. That contract provides that the Hospital Authority will ground lease the Project Area, which will then be subleased to tenants, primarily retail establishments. In summary, the redevelopment is a project of the Midwest City Memorial Hospital Authority, and the City is exercising a power of eminent domain to supply property to the Authority in those circumstances where the landowners decline to sell their property.

¶4 The House of Realty, Inc., declined the offer made by Midwest City for its property. The offer did not include any relocation expenses or business losses. The House of Realty has been located in its present location near the corner of South Air Depot and 29th Street for more than thirty years. In an effort to stay at its location near Tinker Field, House of Realty offered to transfer title to all of its property, except for its office building, and then remodel that building to be consistent with the architecture of the new construction. House of Realty also offered to add parking and storage areas, and to make other improvements consistent with the new construction and the Project. The City Manager of Midwest City initially expressed approval of this plan, but the City of Midwest City subsequently rejected this offer.

¶5 The House of Realty provides rental services to military and other personnel employed at Tinker Field. The parties stipulated that these rental services constitute a substantial part of the total business of House of Realty, and that "Relocation of their offices would be ruinous to their business of providing rental services to military and other personnel who work at Tinker Field." This military facility is located south of 29th Street, and one of its entrances is located on South Air Depot, a short distance from the House of Realty. The City has stipulated that its officials have "searched the entire City for a comparable location [to be occupied by the House of Realty] and have found none." A portion of the property the City seeks to condemn is also used by a restaurant.

¶6 Midwest City brought a condemnation proceeding against the House of Realty, Inc. (Landowners). The City's petition to condemn the property stated that "Plaintiff has deemed advisable and necessary to own, in fee simple, certain private properties for economic development purposes and uses incidental thereto." Attached to the City's Petition is a Resolution stating that "economic development is a legitimate public purpose for which municipalities can condemn private property."[1] Both Petition and Resolution are silent on whether the property the City seeks to condemn is blighted, or if it possesses some attribute justifying the exercise of an eminent domain power other than economic development. Two months later the City filed an amended petition stating the same language that certain private properties were necessary for economic development purposes.

¶7 The City argued that it could exercise a general power to condemn lands pursuant to <u>27 O.S.2001 § 5</u>,[2] and that its stated purpose of economic development was a public purpose that justified the exercise of such power. Commissioners were appointed to appraise the property. Midwest City filed a brief in support of its motion to instruct Commissioners, and stated that it was relying upon <u>11 O.S.2001 § 22-105</u>[3] as authority for eminent domain, and further argued that <u>11 O.S.2001 § 22-104</u>[4] did not apply.

¶8 Landowners argued that the City possessed an eminent domain power to take their land for economic redevelopment if the City exercised such power pursuant to the Urban Renewal Act (<u>11 O.S.2001 §38-101</u> - §38-123), or the Neighborhood Redevelopment Act (<u>11 O.S.2001 §40-101</u> - §40-115). Landowners argued that the City had not followed the Neighborhood Redevelopment Act, that <u>27 O.S.2001 § 5</u> did not provide authority for the City to condemn property for economic redevelopment, that pursuant to <u>11 O.S. 2001 § 22-104</u>(3) Landowners were entitled to additional compensation (including business losses and relocation expenses), and that the City had not met requirements for condemning the property. Midwest City disagreed and stated that it relied upon <u>27 O.S.2001 § 5</u> as authority to condemn the property. The City stated that it need not follow the Urban Renewal Act or the Neighborhood Redevelopment Act.

¶9 On January 25, 2002, an evidentiary hearing was held in the District Court on the motion for, and objection to, instructions to the Commissioners. The testimony of the Development Services Director for the City of Midwest City described the project. When asked why the City "elected not to follow any of the special statutes," he explained that one reason was that the Authority was providing a source of funding for the City. His testimony also revealed that the Urban Renewal and Neighborhood Redevelopment Acts have procedures that involve certain public hearings, and the City would be required to make certain determinations of conditions of the property in order to officially determine that it was blighted for the purposes of those statutes. Hearings and a determination that blight was present would, pursuant to these special statutes, precede any condemnation proceedings in a District Court.

¶10 The Development Services Director stated that the City decided to develop the property in the manner it did because the City thought that economic development was a legitimate public function, the Hospital Authority was making funds available for the project, and the property didn't meet all of the definitions for blighted conditions. The Director agreed with counsel that Urban

Case 5:07-cv-00578-HE   Document 19-4   Filed 08/20/07   Page 32 of 45

Renewal or Neighborhood Redevelopment Acts have procedures that allow the public to be involved with the process that determines whether property is blighted. He then explained that the City did give notice to the public of its meetings on the project. He stated that people attending the meetings would have known that the City "was acquiring property in the area."

¶11 In summary, the City argued that economic redevelopment was a public purpose, and that a municipality such as Midwest City could exercise eminent domain for a public purpose. Thus, according to the City, it could exercise eminent domain to condemn property if the purpose of the taking was economic development. The City argued that acts such as the Urban Renewal Act or the Neighborhood Redevelopment Act were possible alternatives for municipalities to use in redevelopment, but neither were required when the City itself, as opposed to a public trust, was the entity exercising eminent domain. Landowners asserted that specific statutes on economic development must be followed by a municipality when it sought to exercise eminent domain for economic development.

¶12 In March of 2002 the Report of Commissioners was filed, and they determined that just compensation for the condemned property was $375,000.00. Landowners objected and challenged the City's authority to condemn the property pursuant to 27 O.S.2001 § 5. They also argued that the City did not make any findings that taking the property was necessary, or that the property was blighted. Landowners also objected to the amount of compensation.

¶13 Then, while the condemnation proceeding was pending, the City of Midwest City passed two resolutions linking its Project to specific redevelopment statutes. On April 9, 2002, the City of Midwest City passed Resolution No. 2002-05. The Resolution states that the City and the Hospital Authority "wish to facilitate reinvestment in historic downtown Midwest City in accordance with the Local Development Act, 62 O.S. §§ 850 et seq., as amended." Also on April 9, 2002, the Hospital Authority passed Resolution HA 2002-01 stating the same language.

¶14 On April 23, 2002, the City passed Resolution 2002-07. The Resolution states that the City and the Authority are "undertaking concurrent actions to facilitate reinvestment in historic downtown Midwest City in accordance with the Local Development Act, 62 O.S. §§ 850 et seq., as amended." This Resolution states in part:

> 1. Pursuant to the Local Development Act, 62 O.S. §§ 850, et seq., as amended, the City hereby authorizes the Authority in connection with the Midwest City Downtown Redevelopment Project to exercise the power to: cause the Project Plan to be prepared; to submit the proposed Project Plan to the City . . .
> 2. The Authority shall prepare and submit the Project Plan to the City.
> 3. Upon submission by the Authority, the City shall formally consider adoption of the Project Plan.

One month later on May 28, 2002, the City of Midwest City passed Resolution No. 2002-11. This Resolution determined that the Project Area is blighted, and stated that the City Council was authorized to perform the redevelopment pursuant to 11 O.S.2001 § 22-104.

¶15 On August 27, 2002, the City passed Ordinance No. 2852. The ordinance states in part that:

> SECTION 10. Acquisition of the redevelopment project property within the Increment District by the City of Midwest City is authorized and confirmed pursuant to its general powers to exercise the right of eminent domain for any municipal purpose and to carry out the purposes of the Local Development Act in accordance with 11 Okla. Stat. § 22-1043(3), (8).

> SECTION 15. The Midwest City Hospital Authority, a public trust, is designated as the public entity authorized to carry out and administer the provisions of the Project Plan and to exercise all powers necessary thereto except those powers reserved to the municipal governing body by this ordinance and the Local Development Act at 62 Okl. Stat. § 854.

In October of 2002 the City of Midwest City filed an amended petition that requested the appointment of Commissioners. The petition asserted that the City possessed eminent domain to take the property pursuant to 11 O.S.2001 § 22-104(3) &(8) for purposes of the Local Development Act. The City later filed a motion for the court to confirm the previous Report made by the Commissioners.

¶16 The trial court overruled the objections to the Report of the Commissioners and confirmed the Report. Landowners appealed. We retained the appeal and heard oral argument en banc. The trial court's order in City of Midwest City v. House of Realty, Inc., is on appeal in Okla. Sup. Ct. No. 100,064. In a companion case, Okla.Sup.Ct. No. 100,065, Midwest City brought a similar condemnation proceeding to acquire property located in the Project Area. Landowners requested that business losses be included in the amount of the award. They asserted that their property was used as rental property, and that such use should be included in the determination of fair market value. They also requested that relocation expenses be included. They challenged the City's right

Case 5:07-cv-00578-HE    Document 19-4    Filed 08/20/07    Page 33 of 45

to condemn the property. At oral argument before the Court *en banc*, Defendants in both appeals stated that they seek reversal of the trial court's confirmation of the amount of the award, and a reversal of the trial court's action in overruling their objection to the City's taking. We have treated the two appeals as companion appeals, and now consolidate them for the sole purpose of one opinion on the issue of the City's authority to condemn the property for blight removal and economic redevelopment by a public trust.

II.

¶17 The Legislative power of the State includes the power of eminent domain. *Berman v. Parker,* 348 U.S. 26, 31-32, 75 S.Ct. 98, 99 L.Ed. 27 (1954). A municipality, the City of Midwest City claims to possess this power by reason of the Local Development Act and 11 O.S.2001 §§ 22-104(3) &(8). The stated purpose of the Local Development Act, 62 O.S.2001 §§ 850-869, is to implement Article 10 § 6C of the Oklahoma Constitution. The purposes of the Act are served by a municipality (1) granting incentives and exemptions from taxation, (2) allowing apportionment of an increment of local taxes and fees, (3) planning and carrying out development and redevelopment, and (4) using local taxes and fees for financing.62 O.S.2001 § 851.[5] Section 851 does not contain any reference to eminent domain. Article 10 § 6C also does not contain any reference to a power of eminent domain.[6]

¶18 The City of Midwest City agrees that the Local Development Act does not contain any express grant of eminent domain authority to municipalities. The City argues that its authority to exercise eminent domain power when executing provisions of the Local Development Act is implied in § 854 of the Act which lists additional powers granted to municipalities and states in part that:

> In addition to any other powers conferred by law, a city, town or county may exercise any powers necessary to carry out the purpose of this act, including power to: . . . .
> 18. Do all things necessary or convenient to carry out the powers granted in this act and otherwise authorized by the laws of this state.
> 62 O.S.Supp.2003 § 854 (18).

The City then combines this language with a general eminent domain power found in 11 O.S.2001 § 22-104 (3) & (8).

> Every municipality shall have the right to: . . .
> 3. Exercise the right of eminent domain for any municipal purpose, within or without its corporate limits, and to establish, lay, and operate any plant or pipeline upon any land or right-of-way taken pursuant to eminent domain. Any business or profession which is affected by the right of eminent domain as exercised pursuant to the provisions of this section shall be considered as a property right of the owner thereof and proper allowance therefor shall be made; . . .
> 8. Exercise powers necessary to carry out the purpose of the Local Development Act as set forth in Section 854 of Title 62 of the Oklahoma Statutes.

11 O.S. § 22-104 (3) & (8).

The City argues that it has a general power to condemn property for a public purpose, in this case economic development and blight removal, and that this general power is not limited unless a City decides to follow a particular redevelopment statutory scheme that limits the exercise of the City's general condemnation power.

¶19 The power of eminent domain lies dormant within the State "until such time as the Legislature by specific enactment delineates the manner and through whom it may be exercised." *City of Tahlequah v. Lake Region Elec., Co-op., Inc.,* 2002 OK 2, ¶ 7, 47 P.3d 467, 471. The Legislature, and not a municipality, "by specific enactment designates the occasion, modes, and agencies by which it [the eminent domain power] may be placed in operation." *City of Pryor Creek v. Public Service Co. of Oklahoma,* 1975 OK 81, 536 P.2d 343, 345 - 346, (explanation added). A municipality may not exercise a power of eminent domain in the absence of statutory authority. *Id.*

¶20 The Local Development Act does not expressly give authority to exercise eminent domain. A project may be created pursuant to the Local Development Act without the exercise of eminent domain by any entity. Eminent domain is not necessary to carry out those powers expressly conferred by § 854 of the Local Development Act. We also conclude that a municipality exercising power pursuant to § 22-104 (8) is not given an implied eminent domain power. The Legislature has tied the power of eminent domain for an economic public purpose to removal of blight when municipalities and public trusts jointly create such projects, and a municipality is not possessed with an unfettered discretion to condemn property for economic redevelopment projects outside of the scope of statutory schemes that the Legislature has provided for removal of blighted property. These conclusions are supported by how the Legislature has designed statutes for economic redevelopment and blight removal.

¶21 Our State Constitution sets limits on the State's exercise of its eminent domain power.[7] Private property may not be taken or damaged by the condemning agency unless the taking or damage is necessary for the accomplishment of a lawful public purpose. *Luccock v. City of Norman,* 1978 OK 66, 578 P.2d 1204, 1206, *citing,* Okla. Const. Art. 2 §§ 23, 24. Whether the property is taken for a public purpose presents a judicial question. *Public Service Co. of Oklahoma v. B. Willis, C.P.A., Inc.,* 1997 OK 78, ¶ 19, 941 P.2d 995, 1000.

¶22 The cases before us involve a municipality using eminent domain for the purpose of economic redevelopment and blight removal in a joint project with a public trust. Many redevelopment statutes use condemnation to economically redevelop areas that have become blighted. These statutes frequently authorize private use of the property after the blighted conditions are removed. For example, one author has explained:

> Urban redevelopment statutes were upheld almost unanimously even though following clearance, redevelopment sites were usually sold to private redevelopers. The courts declared that resale for private use was "incidental" to the main justification for these laws: "blight" removal. Removing blight was, constitutionally, a sufficient public purpose.

12 *Thompson on Real Property,* § 98.02(d), (David A. Thomas ed., 1994), (Supp.2003), (note omitted).

In *Isaacs v. City of Oklahoma City,* 1966 OK 267, 437 P.2d 229, *cert. denied,* 389 U.S. 825, 88 S.Ct. 63, 19 L.Ed.2d 79 (1967), this Court upheld the constitutionality of urban renewal laws that allowed post-condemnation use of the property by private interests. We said:

> Without exception, redevelopment programs have been upheld against this type of objection, *usually on the grounds that the public use or public purpose is legitimately served by the legislative object of slum or blighted area clearance,* and the fact that private interests benefit incidentally or that private parties acquire ownership *after the public purpose of the elimination of the undesirable conditions has been served,* is merely incidental to the main legislative purpose.

*Isaacs v. City of Oklahoma City,* 437 P.2d at 234, emphasis added.

Both *Thompson* and *Isaacs* make a distinction between removal of blight and economic redevelopment. The former is the public purpose that constitutionally justifies the subsequent sale of the property for private use. Midwest City's efforts at redevelopment are best understood in the context of how the Legislature has linked the removal of blight with economic development.

¶23 In 1959 the Legislature created two urban renewal Acts, and a third in 1961.[8] *Isaacs,* 437 P.2d at 235. All three statutory schemes provided for the creation of a municipal Urban Renewal Authority after a corresponding local governing body adopted a resolution as statutorily specified. 11 O.S.Supp.1959 §§ 1607, 1609(a), 1657(a).[9] All three statutory schemes expressly provided for an Urban Renewal Authority exercising a power of eminent domain.[10] All three statutory schemes used similar definitions for a "blighted area."[11] These three statutory schemes were combined, with some modifications, and codified into our present Article 38 of Title 11 "Urban Renewal" which, except as otherwise provided therein, applies to all municipalities in this state. 11 O.S.2001 § 38-101.

¶24 The current urban renewal statutes provide that a municipality formulates a program "to eliminate and prevent the development or spread of blight, to encourage needed rehabilitation, and to provide for the redevelopment of blighted areas . . . ." 11 O.S.2001 §38-103. An urban renewal authority may exercise the power of eminent domain. 11 O.S.2001 § 38-111(A). An Urban Renewal Authority possesses authority to make relocation payments "for moving expenses and losses of property" to persons, families, or businesses displaced by an urban renewal project. 11 O.S.2001 §38-108(A)(8). See also 63 O.S.2001 §§ 1092.1 -1099 (Oklahoma Relocation Assistance Act). In sum, a municipality may achieve urban renewal through the mechanism of an Urban Renewal Authority.

¶25 In 1981 the Legislature created the Central Business District Redevelopment Act. 11 O.S.1981 § 40-101. The Act's purpose was to "promote, stimulate and develop the general and economic welfare of this state and its communities and to assist in the development and redevelopment of central business district areas of cities, . . . ." 11 O.S.1981 § 40-102. The Act gave municipalities the authority to create a redevelopment plan (11 O.S.1981 § 40-104), and a municipality, "upon a two-thirds (2/3) vote of the members of the governing body, shall have the right to acquire by condemnation any interest in real property, . . . [and] [a]ny such city may exercise the power of eminent domain." 11 O.S.1981 § 40-105(A), (material added). As an alternative to a municipality developing and executing a redevelopment plan, the Central Business District Redevelopment Act provided that a public trust could be organized "for the purpose of redevelopment of blighted areas." 11 O.S.1981 § 40-112. A public trust organized for this purpose was given the authority of eminent domain.11 O.S.1981 § 40-115.

Case 5:07-cv-00578-HE   Document 19-4   Filed 08/20/07   Page 35 of 45

¶26 In 1998 the Legislature amended the Central Business District Redevelopment Act and renamed it the Neighborhood Redevelopment Act. 11 O.S.Supp.1998 § 40-101. Several changes were made in the Act. For example, the former Act declared its purpose to include: "promoting the general welfare of the citizens of this state, *by authorizing cities to acquire certain property and to issue special obligation bonds for the financing of redevelopment projects*." 11 O.S.1991 § 40-102, (emphasis added). This language was amended to: "promoting the general welfare of the citizens of this state, *by authorizing cities and towns to establish redevelopment trust authorities,* and to authorize such authorities to undertake redevelopment activities within such neighborhoods." 11 O.S.Supp.1998 § 11-40-102, (emphasis added).

¶27 The statute that formerly provided a municipality with an express power of eminent domain for the purpose of the Act, 11 O.S.1991 § 40-105, was repealed as part of the 1998 amendments. The 1998 amendments expanded the scope of the Act from central business districts to other areas in municipalities and towns. However, the Act no longer provided the alternative of authorizing either a municipality or a public trust to execute the provisions of the Act. The Neighborhood Redevelopment Act requires a municipality to work with a public trust "which will undertake the redevelopment activities on behalf of such city or town." 11 O.S.Supp.1998 § 40-104. In sum, the Neighborhood Redevelopment Act requires a municipality to achieve the economic redevelopment through a redevelopment trust authority.

¶28 The Urban Renewal Act, Neighborhood Redevelopment Act, and Local Development Act contain definitions of blight. The Urban Renewal Act's definition of "blighted area" is broad for the purposes of urban renewal, and may be based upon *one or several* factors that (1) substantially impair or arrest the sound growth of a municipality or (2) constitute an economic or social liability or (3) endangers life or property by fire or other causes or (4) are conducive to ill health, transmission of disease, mortality, juvenile delinquency, or to crime and by reason thereof, is detrimental to the public health, safety, morals or welfare. 11 O.S.2001 § 38-101(8).[12]

¶29 Although the presence of blight may be based upon the presence of a single factor when applying the Urban Renewal Act, the Neighborhood Redevelopment Act requires the presence of *a majority of ten factors*.

> The following terms, whenever used or referred to in this act, shall, unless a different intent clearly appears from the context, be constructed to have the following meaning:
> 1. "Blighted conditions" means conditions which, *because of the presence of a majority of the following factors*, substantially impair or arrest the sound development and growth of the municipality or constitute an economic or social liability or are a menace to the public health, safety, morals or welfare in its present condition and use:
> a. a substantial number of deteriorated or deteriorating structures,
> b. predominance of defective or inadequate street layout,
> c. unsanitary or unsafe conditions,
> d. deterioration of site improvements,
> e. absentee ownership,
> f. tax or special assessment delinquency exceeding the fair value of the land,
> g. defective or unusual conditions of title,
> h. improper subdivision or obsolete platting or land uses,
> i. the existence of conditions which endanger life or property by fire and other causes, or
> j. conditions which create economic obsolescence, or areas containing obsolete, non-functioning or inappropriately developed structures;

11 O.S.2001 § 40-113(1), (emphasis added).

¶30 The Local Development Act's definition for blight occurs in the context of a definition for a "reinvestment area," and the Act provides that an area may become blighted by *one or more* of certain factors. The definition of a blighted area in the Local Development Act also incorporates the definition for a blighted area that is used in the Urban Renewal Act.

> 17. "Reinvestment area" means any area located within the limits of a city, town or county requiring public improvements, including but not limited to transportation-related projects identified by any transportation authority pursuant to Section 1370.7 of Title 68 of the Oklahoma Statutes, to reverse economic stagnation or decline, to serve as a catalyst for retaining or expanding employment, to attract major investment in the area or to preserve or enhance the tax base or in which fifty percent (50%) or more of the structures in the area have an age of thirty-five (35) years or more. Such an area is detrimental to the public health, safety, morals or welfare. *Such an area may become a blighted area because of any one or more of the following factors*: dilapidation; obsolescence; deterioration; illegal use of individual structures; presence of structures below minimum code standards; abandonment; excessive vacancies; overcrowding of structures and community facilities; lack of ventilation, light or sanitary facilities; inadequate utilities; excessive land coverage; deleterious land use or layout; depreciation of physical maintenance; and lack of community planning. *Such an area includes a blighted area as defined in Section 38-101 of Title 11 of the Oklahoma Statutes* at the time of approval of the project plan; and

Case 5:07-cv-00578-HE   Document 19-4   Filed 08/20/07   Page 36 of 45

62 O.S.Supp.2003 § 853 (17), (emphasis added).

Although the definition of a "blighted area" in § 853 "includes a blighted area as defined . . . [by the Urban Renewal Act]," § 853 does not require applying the Urban Renewal definition in order for an area to be blighted for the purpose of the Local Development Act.

¶31 The definition of a "blighted area" in the Local Development Act is broader, and more easily applied by a municipality than the definitions in either the Urban Renewal or Neighborhood Redevelopment Acts. The Neighborhood Redevelopment Act requires the presence of a majority of ten factors. The Urban Renewal Act requires that the factors used to show the presence of a blighted area have at least one of four effects on the municipality: substantial impairment of growth, economic or social liability, danger to life or property, or detrimental conduciveness to disease or social disorder. 11 O.S.2001 § 38-101(8). Such predicates are not required by the Local Development Act.

¶32 Both the Urban Renewal Act and the Neighborhood Redevelopment Act provide certain benefits to landowners that the Local Development Act does not provide. For example, an urban renewal plan may be adopted by a municipal governing body if it finds that "[a] feasible method exists for the relocation of families and businesses who will be displaced from the urban renewal area in decent, safe and sanitary accommodations within their means and without undue hardship to such families and businesses . . . ." 11 O.S.2001 § 38-106(E). The Urban Renewal and Neighborhood Redevelopment Acts provide for payments to displaced families and businesses in the form of relocation assistance. 11 O.S.2001 § 38-108(8) and § 40-109.[13]

¶33 The City of Midwest City argues for being allowed to use the least restrictive definition for a "blighted area" when condemning private property without an express grant of that authority, although the Legislature has imposed more restrictive definitions for blight when express statutory authority for eminent domain is granted to a municipality and a public trust implementing an economic redevelopment plan. The absence of a grant of authority to condemn property in the Local Development Act is consistent with that Act's absence of protections for landowners.

¶34 The Legislature has expressed a public policy to provide certain benefits to landowners when their property is taken for economic development by the concerted effort of municipalities and their public trusts. The City of Midwest City has failed to point to any public policy that would support its argument that the Legislature did not want to provide such benefits when a municipality is the sole named party seeking to condemn property for economic development engaged in by a municipality and an associated public trust.

¶35 The City of Midwest City states that the property for its project is blighted for purposes of the Local Development Act. The City's made this determination using, with one exception, language from the Local Development Act. The City of Midwest City passed ordinance No. 2002-11 on May 28, 2002, and stated therein:

> WHEREAS, the members of the City Council have personal knowledge of the conditions prevailing in the Project Area, and find the following conditions existed as of January 1, 1999, prior to the Economic Development Resolutions, and continue to the present:
> 1. the Project Area has been underdeveloped for many years; and
> 2. the Project Area requires public improvements to reverse economic stagnation or decline, to serve as a catalyst for retaining or expanding employment, to attract major investment in the area and enhance the tax base; and
> 3. fifty percent (50%) or more of the structures in the Project Area have an age of thirty-five (35) years or more; and
> 4. the Project Area is and was a blighted area because of each and a combination of the following factors: dilapidation, obsolescence, deterioration, presence of structures below minimum code standards, abandonment, excessive vacancies, arrested economic development, deleterious land use or layout, depreciation of physical maintenance and lack of community planning; and
> 5. the Project Area is and was a reinvestment area under the terms of Section 853 of Title 62 of the Oklahoma Statutes and is and was unproductive, underdeveloped and blighted under Article 10, Section 6C of the Oklahoma Constitution; and
> 6. pursuant to Oklahoma statutes, the Project Area is and was detrimental to the public health, safety or welfare; . . .

Paragraph number 4 above refers to "arrested economic development" of the Project Area. This language is not listed as a factor in § 853, but is one that may be used to show blight for the purposes of the Urban Renewal Act. 11 O.S.2001 § 38-101(8).

¶36 The City determined that the Project Area was detrimental to the public health, safety or welfare, and blighted, and therefore subject to an exercise of a general eminent domain power by the City to effectuate economic development. Landowners challenge this conclusion. They agree that the Local Development Act provides a definition for a blighted area. However, they argue that, unlike the Urban Renewal and Neighborhood Redevelopment Acts, the Local Development Act fails to provide guidelines or limits

on a municipality's exercise of discretion when exercising an eminent domain power for the purpose of economic redevelopment. They argue that the absence of such limits or guidelines makes unconstitutional the exercise of a general eminent domain power for the purpose of economic redevelopment. We need not address this challenge by the Landowners.

¶37 A municipality, the City of Midwest City, and a public trust, the Midwest City Memorial Hospital Authority, have a joint project to remove blighted property and establish economic redevelopment. The municipality and public trust did not follow those statutes that the Legislature has provided for circumstances when a municipality and a public trust jointly remove blighted property and establish economic redevelopment. The City argues that it followed the Local Development Act. We need not decide, for the purpose of these appeals, whether the City complied with that Act, for that Act contains no express, or necessarily implied, grant of an eminent domain power to a municipality.

¶38 We reverse the orders of the District Court herein because the City did not possess authority pursuant to its general eminent domain powers to condemn the property apart from those statutes regulating the joint conduct[14] of municipalities and public trusts when removing blighted property and creating economic redevelopment. The orders of the District Court are reversed.

¶39 ALL JUSTICES CONCUR

## FOOTNOTES

[1] Petition by City of Midwest City (June 28, 2001), Exhibit B, Resolution No. 2001-01, January 23, 2001, .O.R. at 6, Okla. Sup. Ct. No. 100, 064.

[2] 27 O.S.2001 § 5:
Any county, city, town, township, school district, or board of education, or any board or official having charge of cemeteries created and existing under the laws of this state, shall have power to condemn lands in like manner as railroad companies, for highways, rights-of-way, building sites, cemeteries, public parks and other public purposes.

[3] 11 O.S.2001 § 22-105:
Private property may be taken for public use, or for the purpose of giving a right-of-way or other privilege for any necessary purpose, in the manner provided by law; but in every case the municipality shall make adequate compensation to the person or persons whose property shall be taken or injured thereby as provided by law.

[4] 11 O.S. 2001 § 22-104:
Every municipality shall have the right to:
1. Engage in any business or enterprise which may be engaged in by a person, firm, or corporation by virtue of a franchise from the municipality and to do all things necessary and proper in the discretion of the governing body of the municipality pursuant to the authority granted to it by the Constitution and laws of this state to maintain said business or enterprise for the benefit of the municipality;
2. Acquire, own, and maintain, within or without its corporate limits, real estate for sites and rights-of-way for any municipal purpose including but not limited to public utility and public park purposes, and for the location thereon of waterworks, electric light and gas plants and other facilities for generating or distributing energy, ports, airports, hospitals, quarantine stations, garbage reduction plants, pipelines for the transmission and transportation of gas, water, stormwater, and sewerage, and for any plant for the manufacture of any material for public improvement purposes and public buildings;
3. Exercise the right of eminent domain for any municipal purpose, within or without its corporate limits, and to establish, lay, and operate any plant or pipeline upon any land or right-of-way taken pursuant to eminent domain. Any business or profession which is affected by the right of eminent domain as exercised pursuant to the provisions of this section shall be considered as a property right of the owner thereof and proper allowance therefor shall be made;
4. Exercise the right to manufacture any material for public improvement purposes, and to barter or exchange the same for other material to be used in public improvements in the municipality, or to sell the same;
5. Issue and sell bonds subject to and by virtue of the provisions of the Constitution of this state and in the manner and form provided by law in order to raise the monies to establish and maintain public utilities, parks, and improvements;
6. Sell or lease to any consumer or corporation, within or without its boundaries, the commodities and services supplied by such municipally owned or controlled public utility, business enterprise, or improvement and to enter into such short- or long-term contracts, agreements, and stipulations and do all things necessary and proper to further the capability of the municipality pursuant to the authority granted to it by the Oklahoma Statutes and the Constitution of this state to provide said commodities and services as may be deemed appropriate by the governing body of the municipality;
7. Lease at a stipulated rental rate any public improvement or utility from any person, firm, or corporation which will contract to furnish the same. Any such rental contract shall reserve for the municipality the option to purchase the improvement or utility in the future; and
8. Exercise powers necessary to carry out the purpose of the Local Development Act as set forth in Section 854 of Title 62 of the

Case 5:07-cv-00578-HE   Document 19-4   Filed 08/20/07   Page 38 of 45

§ 62 O.S.2001 § 851:
The Local Development Act shall serve to implement and execute Section 6C of Article X of the Oklahoma Constitution as approved by the voters of the State of Oklahoma on November 6, 1990, by:
1. Providing for the granting of incentives and exemptions from taxation within certain areas, placing restrictions thereon, and limiting the time period for the exemptions, as authorized by subsection A thereof;
2. Providing for apportionment of an increment of local taxes and fees, placing restrictions thereon, and limiting the time period for the apportionment, as authorized by subsection B thereof; and
3. Providing for the planning, financing, and carrying out of development and redevelopment within certain areas, as authorized by subsection C thereof.
Nothing in the Local Development Act shall be construed in a manner contrary to or inconsistent with the provisions of said constitutional provision.
The Legislature hereby finds that historic preservation, reinvestment or enterprise areas as defined under this act are unproductive, undeveloped, underdeveloped or blighted areas pursuant to subsection C of Section 6 of Article X of the Oklahoma Constitution.

[6] Okla. Const. Art. 10 § 6C:
Tax relief for historic preservation, reinvestment, or enterprise areas--Economic stagnation or decline--Use of local taxes and fees for public investments--Development or redevelopment of unproductive, etc. areas

A. The Legislature, by law, may grant incorporated cities, towns, or counties the ability to provide incentives, exemptions and other forms of relief from taxation for historic preservation, reinvestment, or enterprise areas that are exhibiting economic stagnation or decline. Relief from taxes imposed by other local taxing jurisdictions shall only be allowed by contractual arrangement with the municipal or county governing body. The law shall require public hearings before such relief may be granted and shall provide for the local initiative power and referendum of the people. The Legislature may set limitations on the cumulative incentives and relief provided pursuant to the provisions of this section, the time period for the exemptions, the geographical area of the jurisdiction covered, the percentage of the tax base of the jurisdiction eligible for the relief programs, and threshold limits of investment credit and jobs created.
B. The Legislature, by law, may authorize that the cities, towns, or counties may specifically use local taxes and local fees, in whole or in part, for specific public investments, assistance in development financing, or as a specific revenue source for other public entities in the area in which the improvements take place and may direct the apportionment of the taxes and fees specified in this subsection for the purposes specified in this section. The Legislature may establish for this subsection, the same procedures and limitations authorized in subsection A of this section.
C. The Legislature, by law, may authorize any city, town, or county to plan, finance and carry out the development or redevelopment of areas determined by the governing body of such city, town, or county to be unproductive, undeveloped, underdeveloped or blighted. The authority of the county shall be limited to the unincorporated areas of such county but any city, town or county may by agreement jointly plan, finance or carry out a development plan with any other public or private entity for one or more development projects within their respective boundaries.
D. Any city, town, or county may exercise the provisions of this section separately or in combination with powers granted by any other laws of this state.

[7] Okla. Const. Art. 2 § 23:
No private property shall be taken or damaged for private use, with or without compensation, unless by consent of the owner, except for private ways of necessity, or for drains and ditches across lands of others for agricultural, mining, or sanitary purposes, in such manner as may be prescribed by law.

Okla. Const. Art. 2 § 24:
Private property shall not be taken or damaged for public use without just compensation. Just compensation shall mean the value of the property taken, and in addition, any injury to any part of the property not taken. Any special and direct benefits to the part of the property not taken may be offset only against any injury to the property not taken. Such compensation shall be ascertained by a board of commissioners of not less than three freeholders, in such manner as may be prescribed by law. Provided however, in no case shall the owner be required to make any payments should the benefits be judged to exceed damages. The commissioners shall not be appointed by any judge or court without reasonable notice having been served upon all parties in interest. The commissioners shall be selected from the regular jury list of names prepared and made as the Legislature shall provide. Any party aggrieved shall have the right of appeal, without bond, and trial by jury in a court of record. Until the compensation shall be paid to the owner, or into court for the owner, the property shall not be disturbed, or the proprietary rights of the owner divested. When possession is taken of property condemned for any public use, the owner shall be entitled to the immediate receipt of the compensation awarded, without prejudice to the right of either party to prosecute further proceedings for the judicial determination of the sufficiency or insufficiency of such compensation. The fee of land taken by common carriers for right of way, without the consent of the owner, shall remain in such owner subject only to the use for which it is taken. In all cases

of condemnation of private property for public or private use, the determination of the character of the use shall be a judicial question.

[8] 11 O.S.Supp.1959 §§ 1601-1620 (Urban Redevelopment Law); 11 O.S.Supp.1959 §§ 1651-1670 (Urban Redevelopment Act); 11 O.S.1961 §§ 1701 - 1718 (Urban Redevelopment Act of 1961).

[9] Sections 1609(a) and 1659(a) are identical and provided in part: "There is hereby created in each incorporated city to which this Act is applicable, a public body corporate to be known as the 'Urban Renewal Authority' . . . ."
Sections 1607, 1857 required a resolution by the local governing body determining that an Urban Renewal Authority should exercise its power, that a blighted area existed, and that redevelopment of the area was necessary.
In cities with a population of 10,000 or less a vote of the people was required prior to an urban renewal authority exercising its statutory powers.11 O.S.1961 § 1707.

[10] 11 O.S.Supp.1959 §§ 1613, 1663, and 11 O.S.1961 § 1712.

[11] 11 O.S.Supp.1959 §§ 1603(g), 1653(g); 11 O.S.1961 § 1703(g).

[12] 11 O.S.2001 §38-101(8):
8. "Blighted area" shall mean an area in which there are properties, buildings, or improvements, whether occupied or vacant, whether residential or nonresidential, which by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation or open spaces; population overcrowding; improper subdivision or obsolete platting of land, inadequate parcel size; arrested economic development; improper street layout in terms of existing or projected traffic needs, traffic congestion or lack of parking or terminal facilities needed for existing or proposed land uses in the area, predominance of defective or inadequate street layouts; faulty lot layout in relation to size, adequacy, accessibility or usefulness; insanitary or unsafe conditions, deterioration of site or other improvements; diversity of ownership, tax or special assessment delinquency exceeding the fair value of the land; defective or unusual conditions of title; any one or combination of such conditions which substantially impair or arrest the sound growth of municipalities, or constitutes an economic or social liability, or which endangers life or property by fire or other causes, or is conducive to ill health, transmission of disease, mortality, juvenile delinquency, or crime and by reason thereof, is detrimental to the public health, safety, morals or welfare;

[13] The three statutory schemes in effect in 1961 provided for relocation assistance to those required to relocate their homes and businesses. 11 O.S.1961 §§ 1610(h), 1660(h), 1710(h). The Central Business District Redevelopment Act also provided for relocation assistance. 11 O.S.1981 § 40-109.

[14] We do not have before us a project that is created, funded, and operated solely by a municipality. We decline to address the power of a municipality in that hypothetical circumstance. Tulsa County Budget Bd. v. Tulsa County Excise Bd., 2003 OK 103, 81 P.3d 662, 672 (the Court does not issue advisory opinions or answer hypothetical questions).

## Citationizer© Summary of Documents Citing This Document

**Oklahoma Supreme Court Cases**

| Cite | Name | Level |
|------|------|-------|
| 2004 OK 97, | HOUSE OF REALTY, INC. v. CITY OF MIDWEST CITY | Discussed at Length |

## Citationizer: Table of Authority

**Oklahoma Supreme Court Cases**

| Cite | Name | Level |
|------|------|-------|
| 1997 OK 78, 941 P.2d 995, 68 OBJ 2213, | PUBLIC SERVICE COMPANY OF OKLAHOMA v. B. WILLIS, C.P.A., INC. | Discussed |
| 2002 OK 2, 47 P.3d 467, 73 OBJ 359, | CITY OF TAHLEQUAH v. LAKE REGION ELECTRIC, CO-OP, INC. | Discussed |
| 1966 OK 267, 437 P.2d 229, | ISAACS v. OKLAHOMA CITY | Discussed at Length |
| 2003 OK 103, 81 P.3d 662, | TULSA COUNTY BUDGET BOARD v. TULSA COUNTY EXCISE BOARD | Discussed |
| 1975 OK 81, 536 P.2d 343, | CITY OF PRYOR CREEK v. PUBLIC SERVICE CO. OF OKL. | Discussed |
| 1978 OK 66, 578 P.2d 1204, | LUCCOCK v. CITY OF NORMAN | Discussed |

**Oklahoma Statutes Citationized, Title 11. Cities and Towns**

| Cite | Name | Level |
|------|------|-------|
| 11 O.S. 22-104 , | Right to Engage in Business - Public Utilities and Improvements - Eminent Domain - Issuance of Bonds - Lease of Public Utility. | Discussed at Length |

| 11 O.S. 22-105, | Condemnation of Private Property. | Discussed |
| 11 O.S. 38-101, | Definitions and Applicability. | Discussed at Length |
| 11 O.S. 38-103, | Workable Program for Utilization of Private and Public Resources. | Cited |
| 11 O.S. 38-106, | Urban Renewal Plan - Public Hearings - Approval and Modification - Disaster Areas. | Cited |
| 11 O.S. 38-108, | Enumerated Authority Powers - Powers and Duties Excluded. | Discussed |
| 11 O.S. 38-111, | Condemnation Powers. | Cited |
| 11 O.S. 40-101, | Short Title | Discussed at Length |
| 11 O.S. 40-102, | Purpose of Act. | Discussed |
| 11 O.S. 40-104, | Redevelopment Plan - Procedure for Adoption. | Discussed |
| 11 O.S. 40-105, | Repealed by Laws 1998, c. 247, § 12, eff. November 1, 1998. | Discussed |
| 11 O.S. 40-109, | Relocation Assistance Plan. | Cited |
| 11 O.S. 40-112, | Repealed by Laws 1998, c. 247, § 12, eff. November 1, 1998. | Cited |
| 11 O.S. 40-113, | Definitions. | Cited |
| 11 O.S. 40-115, | Eminent Domain - Lien Foreclosure. | Cited |

**Oklahoma Statutes Citationized, Title 27. Eminent Domain**

| Cite | Name | Level |
| 27 O.S. 5, | Power to Condemn Lands. | Discussed at Length |

**Oklahoma Statutes Citationized, Title 62. Public Finance**

| Cite | Name | Level |
| 62 O.S. 854, | Additional Powers of Cities, Towns or Counties. | Cited |
| 62 O.S. 853, | Definitions | Cited |
| 62 O.S. 850, | Short Title | Discussed at Length |
| 62 O.S. 851, | Purpose and Construction of Act - Legislative Findings. | Discussed |

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

JAN 1 8 2002

PATRICIA PRESLEY, COURT CLERK
by_____
Deputy

|  |  |
|---|---|
| CITY OF MIDWEST CITY, a body corporate and politic, and a duly constituted and qualified municipality, | ) ) ) ) ) |
| Plaintiff, | ) ) ) |
| - vs - | ) ) |
| HOUSE OF REALTY, INC.; ROBERT J. BARTON; PAMELA L. BARTON-STOBER; DOUGLAS D. STOBER; KATHY L. GIVENS; SHARLETTE R. MADISON; JEFFREY C. TACKETT; HARLAN DRAKE; PHILLIS CASEY; KEITH CASEY; LARRY PHILLIPS; IRIS JONES; DONNA GUNTER; DIANE FRITH; RICHARD SPRIGGS; LEONARD SEWELL; ARTHUR LEWIS; DANNY WATSON; MYRON NICEWANDER; WILLIAM KLUKOSKE; LAWRENCE HAWKINS; FORREST FREEMAN, COUNTY TREASURER OF OKLAHOMA COUNTY; and BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

Case No. CJ-2001-4916-66

## INSTRUCTIONS TO COMMISSIONERS

1.     You are instructed that the plaintiff, City of Midwest City (the "City"), has filed a Petition to condemn for public purposes fee title to certain real property and premises, including all right, title and interest in and to the airspace, light and view above the surface of the lands described on Exhibit "A" attached hereto.

2.    As disinterested freeholders, having no interest in the property, you have been appointed by the Court to serve as Commissioners to consider the injury which the owner of the property will or may sustain, directly or indirectly, by reason of the City's appropriation of the property.

3.    If any of you are not freeholders in Oklahoma County, own any interest in the property or are interested or involved in any like question or taking by eminent domain, then you are not eligible to serve as a Commissioner in this case and should immediately report any such fact(s) to the Court.   Otherwise, if you agree to serve, please sign the Oath furnished to you, have your signature notarized and file the Oath with the Court Clerk or return the Oath to the attorneys for the plaintiff for filing with the Court Clerk.

4.    The Constitution of this State provides: "Private property shall not be taken or damaged for public use without just compensation.  Such compensation shall be ascertained in the method provided by law and paid to the party whose property is condemned."  In determining the injury to be sustained by the owner, you are permitted to exercise your individual judgment which you have acquired through experience and observation.

5.    The term "just compensation" means the payment to owner for the taking of its property by the City of an amount of money that will make owner whole.  In this case, this is the fair

- 2 -

market value of the property.  The property includes the land and any buildings or other things that are attached to the land.

6.    The fair market value of a property is the amount of money which a buyer, who is willing but does not have to buy, would pay an owner, who is willing but does not have to sell, to buy the property.  The fair market value of a property should be determined according to the highest and best use for which it is suitable, regardless of what it may have been used for in the past or what future use owner may have intended for it.

7.    The defendants and their representatives have the right to present to you facts and evidence concerning the use of the property and their opinion as to the injury that the owner will or may sustain by reason of the appropriation.  Likewise, the City and its representatives have the right to present such matters to you.  You should not, however, discuss the issue of the injury to be sustained with either party out of the presence of the other party.  You are not bound by the contentions or opinions of either party, but you may take into consideration any facts and evidence presented to you by the parties.

8.    If in the process of performing your duties as Commissioners you desire further instructions, you may apply to the Court.

9.    You are entitled to be paid a reasonable fee for your services and therefore should maintain detailed, accurate time and expense records.

- 3 -

DATED this 18th day of January, 2002.

JUDGE OF THE DISTRICT COURT

APPROVED As to Form:

Katherine E. F. Bolles
City Attorney
100 North Midwest Boulevard
P. O. Box 10570
Midwest City, Oklahoma 73140
Telephone: (405) 739-1203

- and -

MOCK, SCHWABE, WALDO, ELDER,
  REEVES & BRYANT
A Professional Limited
  Liability Company

By: _____
    James R. Waldo - OBA #9278

Fourteenth Floor
Two Leadership Square
211 North Robinson
Oklahoma City, Oklahoma   73102
Telephone: (405) 235-1110

ATTORNEYS FOR PLAINTIFF

_____
TERRY GUY SHIPLEY - OBA #8183
2600 Van Buren
Suite 2653
P. O. Box 721690
Norman, Oklahoma 73070
Telephone: (405) 360-4200

ATTORNEY FOR DEFENDANTS
HOUSE OF REALTY, INC.,
ROBERT J. BARTON, PAMELA L.
BARTON-STOBER, DOUGLAS D.
STOBER, KATHY L. GIVENS,
SHARLETTE R. MADISON AND
JEFFREY C. TACKETT

- 4 -

# EXHIBIT "A"

Part of the Southwest Quarter (SW/4) of Section Ten (10), Township Eleven (11) North, Range Two (2) West of the Indian Meridian, Oklahoma County, Oklahoma, more particularly described as follows:

Beginning at a point on West line of said Quarter Section North 00°08'37" East a distance of 330 feet from SW corner of said Quarter Section; thence South 89°30'37" East a distance of 440 feet; thence North 00°08'37" East a distance of 175 feet; thence North 89°30'37" West a distance of 440 feet to a point on West line of said Quarter Section; thence South 00°08'37" West along the West line of said Quarter Section a distance of 175 feet to point of beginning.